Case number 19-1190, International Transmission Competitioner v. Federal Energy Regulatory Commission. Mr. Streep for petitioners, Ms. Banta for being responding. Good morning, counsel. Good morning. May it please the court. In this case, FERC committed two cardinal sins of administrative law. First, it changed its policy on an important issue without acknowledging the change and giving reasons for the new policy. Indeed, FERC still doesn't admit that it dramatically has changed the test for assessing the... Well, that's because they are contesting the proposition that they had established a policy which they did not articulate a departure from. They're saying this is a case-by-case, fact-based determination. And we have made a particular fact determination in a couple of cases, but in other cases, in particular facts, there is no policy that we're violating. Is that not what they're saying? Yes. I think that's a fair understanding of their argument, Your Honor. But this court in West Deptford made very clear that merely invoking the idea of case-by-case adjudication is not a get-out-of-jail-free card for adopting a new test without acknowledging it or for treating like companies or like cases in the same way. And that is what FERC has done in this case. And I think all we need to see to do that is...all we need to look at to understand that is FERC's decision in the Neat New York and Gridlions cases. This is not a case...this is not a situation where FERC merely looked at different facts in different cases. Instead, in the Neat New York case, FERC was faced with a company that was a transmission subsidiary of a larger corporate company that held massive amounts of affiliated generation. And if you look at paragraph 51 in Neat New York, where the commission lays out its analysis, the commission says, Neat New York has demonstrated its relationship to affiliated market participants, will not affect the integrity of Neat's investment planning, capital formation, and investment processes. So it says, here's the Order 679 criteria. Here's the test that we're looking at as a whole. The very next sentence says, several facts lead us to this conclusion. So here are the facts that are dispositive as to when the Order 679 independence criteria are met. All of those next two or three sentences talk about the location and the nature of the affiliated generation assets. Because they were all out...most of them were outside of the ISO or the ones within the ISO were small or tied up in long-term contracts, the commission said the Order 679 criteria were met. But the commission... Mr. Street, why you talk about it as changing the test? Because I understand your argument to be, even if it's a totality of the circumstances test, that the agency still has an obligation to apply it in a consistent way. And so it seems like there's sort of two levels of argument. One is whether they've somehow instantiated a new test. But putting that to the side for a moment, assuming that all factors are potentially in play, why isn't it distinction enough that the record in Neat New York and Gridlions didn't reflect some of the kinds of information that the commission relied on here with regard to ITC? And there just weren't direct challenges to the decisional independence of the companies at issue there. So there's no inconsistency where here the commission did have information that caused it to be concerned about ITC driving, planning, and making operational decisions and affecting affiliated generators, that kind of evidence that wasn't present in those other cases. So I think I have three responses to that, Your Honor. First of all, I think you're correct in thinking of this as a two-step argument. We do firmly believe that the commission adopted a new test or a new policy. But even if you believe that the commission is consistently applying the same totality of the circumstances test or whatever you would like to call it, the commission still has to act consistently in the way it applies that new test across cases. And what we have here, even assuming the commission validly used this corporate structure test that is applied to the ITC companies, it has not demonstrated that the ITC companies are less structurally independent than the companies at issue in Neat New York and in Gridliance. And, in fact, on the record that we have, the ITC companies are not less independent. They're, in fact, at least as independent, if not more independent. So I take Your Honor's point that perhaps those issues were not as vigorously litigated in Neat New York and in Gridliance. I would, in response to that point, report to Southwest Airlines and Baltimore Gas and Electric, which says regardless of how vigorously an issue is litigated, the commission's approach to an issue sets the baseline from which the commission has to make reasonable decisions in the future. Here, the commission did square up to the issue of how to evaluate the Order 679 criteria in Neat New York and in Gridliance. And to your point, Your Honor, even though perhaps it wasn't vigorously litigated in all the structural issues, the commission had on the face of its orders in those cases evidence that those transmission subsidiaries were part of a larger corporate family that owned a massive amount of affiliated generation throughout the United States. And yet the commission looked only at the location and the nature of those assets. It didn't look... It also looked there at a factor that's not present here, which is that the market capacity in those cases was pre-committed under long-term contracts. And I think that played a significant role in how much it thought that there was a threat to independence. What's your response? Well, Your Honor, you're correct, but only to the extent that the commission in those cases looked at the commitment of market capacity as to the affiliated generation within the same ISO as the transmission company. Outside of the ISO, it did not look at the commitment at all. It just said those assets are far distant from the transmission company. So in our case, IPC companies have no affiliated generation within the ISO. But here FERC distinguished by saying just outside, close enough for mutual impact. So they are making a distinction. You may be unpersuaded by it, but they're saying it's closer in. Well, FERC did not make that distinction in the orders. It may have hinted at that distinction in its appellate brief. But I think that nicely gets to the point of even if the court believes FERC is applying the corporate structure test properly, it's valid in terms of the APA, then the burden was on FERC to show why the ITC companies were less independent under that corporate structure test than the companies that need New York and GridLions. And the same would go for Your Honor's point, which again, FERC didn't raise any orders about generation just outside of the ISO. So here, just taking those points seriatim, because I think, again, this is a second-level argument, but I think it is a clearly persuasive one for our clients. FERC was concerned in the ITC company's case that the ITC companies had become less independent as a result of the merger and that it gave a couple examples. One was that the ITC companies had a minority representation on their board of directors from their ultimate parent companies. But the commission did not compare that with the companies in New York and GridLions. If it had made that comparison, it would have found that those companies either did not have an independent board at all or they had a board that was majority dominated by the ultimate parent company. The commission also said that the ITC companies had become less independent because they could not issue their own common stock. They had to look to the ultimate parent company to some extent for financing. But again, the commission did not compare that with the companies in New York and GridLions. And if it had, it would have found that those companies also could not issue common stock. So if, and on and on through each step of the corporate structure analysis that the commission made, and the same is also true of the post-doc rationalization about affiliated generalization just outside of the ISO. If it had made that comparison, it would have looked and realized that New York also has 30,000 plus megawatts in the very next interconnection. So we agree with you that the failure to grapple with these factors renders the commission's decision in this case arbitrary. The remedy would be to remand for the commission to grapple with these issues anew and do a better job distinguishing? The remedy would be vacature and a remand to grapple with those issues. And under both Southwest Airlines and West Stepford where you had a similar situation where it looked like FERC was shifting the test or at the very least had not extinguished, had not distinguished on its facts the previous cases under its new test, the court in those cases vacated the orders. And the reason is because the commission is not merely having to do, supply some additional reasoning for something that looks like it can ultimately be sustained. As you said, Your Honor, they have to grapple with these previous cases where the commission found companies that were similarly situated to be fully independent and worthy of a 50-point basis point adder. Go ahead, excuse me. No, no, go ahead, Your Honor. So basically in seeking review by the agency, you argued that the factual situation here was identical to the factual situations that the commission addressed in Neat, New York, and therefore its decision was arbitrary and capricious? I didn't quite understand that to be your argument, that the corporate structure, board of directors, et cetera, was the same. And to the extent it wasn't, then FERC comes back and says, look, we have a lot of precedent. We set an order 679. We weren't going to set up a test. We were going to do this case by case. And we have looked at the facts before us in this case. And it's impossible, says FERC essentially, to think that clients were in the same posture after the merger as they were before. And so what is the effect of that on the level of independence it had? In other words, I didn't take you to argue that there are hundreds of cases out there and FERC has to line up each of them and determine how many members of the board represent certain interests, et cetera, but rather that there was a change here. And what was the change as to those affected by the merger? So, Your Honor, we made, I think, two essential arguments to the commission. The first is that with respect to Neat New York and GridLions, we were more independent than those companies even after the merger. Whether you looked at it in terms of whether we had generation affiliates within the ISO, which we do not, or whether you looked at it in terms of corporate structure. We made both of those arguments below. And again, you're absolutely correct, Your Honor, to say something changed with this merger. But that itself does not answer the question. That just tees up the question. The question is, under what test did these companies become less independent? And under that test, did they become less independent than companies like Neat New York and GridLions that were found to be fully independent and more in a 50-point basis? So, what I'm trying to get at is I don't know what the word grapple means, but we're talking about reasoned decision-making. And at least before the merger, there was one set of circumstances. After the merger, the agency says, you know, the 50-point adder was inappropriate. Circumstances had changed. And you're saying essentially FERC had to match up point by point? I'm just trying to understand how far reasoned decision-making has to go. Well, first of all, reasoned decision-making has to apply the same basic test to like companies. And when you're talking about ITC post-merger, yes, it's different than ITC pre-merger, but it's very similar to the way the companies in Neat New York and GridLions already were. The companies in those cases were already transmission subsidiaries of a larger corporate family that owned affiliated generations. So, at a minimum, the agency had to acknowledge that and say why it wasn't reaching the same conclusion here, that it was not enough to say there had been a change as a result of the merger? Absolutely. At a minimum, the commission had to do two things. First of all, it had to explain why it's applying a test that looks at corporate structure here as opposed to a test that looks at the affiliated generation's location and nature in a basically similar case in Neat New York and GridLions. But even if you get past that and you think the commission is validly applying a corporate structure-focused test here, then it has to show why the corporate structure of ITC post-merger is less independent than the corporate structure of GridLions and Neat New York when both of them are transmission subsidiaries within a larger corporate family. So, here I have a question that has to do with the different procedural postures of the commission decisions in those two cases from the decision here. In those cases, the commission decision is as on the basis of the application of those transfers for the adder. And it's looking at what it thinks are the most significant sort of big-picture independence threats and making a decision. And there aren't ratepayers in there challenging it, as I understand it, or raising the kinds of issues that the ratepayers here are making. So, yeah, the record could have been much more detailed. It could have gone into these questions. But this is in the context of sort of the initial eligibility determination. And so, too, ITC had made an application and got the adder. Here we have a more sort of time has passed. Maybe the commission is learning more about the kinds of things that affect independence. It may be. I mean, I gather that the commission has abandoned or is preparing to abandon this program altogether. So, it's learning more. And here it has a challenge. And evidence is brought before it from ratepayers who object. So, there's going to be, you know, so does it mean if your arbitrary and capricious challenge mean that the commission can't evolve in the level of rigor and inquiry that it applies because in a different posture, in the initial qualification posture where it wasn't really contested, it was satisfied with a different set of information? No, Your Honor. We're not tying the commission's hands here at all. And I think it's slightly overstated to say that the issues were not contested. In those cases, ratepayers came in and contested the applications for the adders and, in fact, specifically raised, at least in New York, specifically raised the issue of affiliation with a parent company that owned generation assets. And the commission fully grappled with this. But I think, first of all, it's important to answer your question directly, which is, no, we are not saying that the commission cannot now adopt a test that looks more rigorously at corporate structure when that's raised and that's more vigorously litigated in this case. Absolutely it can do that. But it has to openly acknowledge, well, in Neat New York, we looked at a similar situation of a transco within a larger corporate family. We looked only at the location and nature of generation. We've come to see the error of our ways. We think it makes sense now to look at corporate structure to assess the Order 679 criteria. And here's why that's consistent with Order 679, and here's why that's consistent with the statute. That way, regulated parties know going forward what the test is. A regulated party in the position of the IPC company would have looked at Neat New York and Bridge Alliance and said, well, we're just like those companies. What's your authority for saying that it has to do that, especially given the different procedural posture that the two determinations arose in? Why does it have to? I mean, as Judge Rogers said, there are countless cases. It has to, what, fess up in a way it didn't? Or what was missing here? It grappled with those cases. Okay. Let me answer that in three parts, Your Honor. First of all, these procedural postures are not as different, I think, as you're suggesting. In all of these cases, the Commission had to decide whether a transco within a larger corporate family was entitled to a particular level of adder. And in all those cases, protesters came in and said, no, they're not. In all of those cases, FERC said, here's our Order 679 criteria, investment planning, capital formation, investment processes, and business structure. In one case, it said, we're going to assess that through looking at the location and size of the generation assets. In another case, it says, we're not going to look at that at all. We're just going to look at corporate structure. So if the Commission is going to make that sort of a shift, it would not need to give a lot of explanation if these cases were clearly different on their facts. It might have just been able to say, this is a different case and we're applying a different test. But where you have a similar corporate structure out of space, it had to explain its work and acknowledge that it was making a change and explain why that change made sense. But again, Your Honor, even if the Commission had validly adopted a corporate structure test, it still has a duty to show why the IPC companies were less structurally independent than these other companies. And the authority for that is just basic administrative law, Southwest Airlines, West Denver. All of those cases say that, you know, regardless of whether it's 100 cases or more like three or four cases, which is what we think is at issue really here, the Commission has to show why like cases are being treated differently. If the Commission wants to distinguish a case on its facts, it has to show why those facts are material and why they're different in this case. And that's what it did not do here. Go ahead, Dick. I hate to extend when we're well over time already, but if you prevail on this issue, we need to reach the second issue in the case. Your issue about the finding. No, because if the court rules for us on our first issue, it will vacate and remand. And the Commission will have to decide what its test is. And I'm sure this time it will at least go through the motions of making the right findings. But again, the Commission, this is not a foreordained outcome one way or the other by any stretch of the imagination. Because even if it applies the corporate structure test, it's going to have to show on a granular level why it's treating the ITC company less favorably. It tried to shift the burden to the petitioners here, but that was inappropriate under both the fact that this is a Section 206 complaint where it was the Commission's burden and under administrative law of treating IT companies. They do have that burden. You've answered the one question. Just one final question on whether the issue was contested in the other cases. I don't see it contested in gridlines. And there is a sentence in Next Era that refers to what sort of looks like an independence challenge. But the interveners say that that really was about whether Next Era had the small scale of a startup, not whether affiliation with generators compromises independence. And so I just think that if FERC is not changing the analysis and if the question is just is it arbitrary and capricious in So we agree that it was not as vigorously litigated in those cases. We haven't contested that point. What we have said is that FERC in those cases did evaluate what its Order 679 criteria was and it did state what its test was for satisfying those criteria. So we very strongly believe, as you know, FERC changed its analysis. That's our first position. But even if FERC did not invalidly adopt its new test, the fact that those issues weren't as vigorously litigated in those previous cases doesn't diminish in any way FERC's duty under Section 206 and under administrative law to show why under its new test the ITC companies are less independent than Meet New York or Gridlines. If it had some other reason, if it wanted to say, no, we're dropping everybody down to 25 now, that would be something it could say. But what it said is we find the ITC companies to be less independent than the company to Meet New York and Gridlines under our new test. But it never compared. It never compared its board. It never compared its ability to issue common stock. And if you look at Baltimore Gas and Electric and Southwest Airlines, which were cases where the commission told this court, well, in the previous precedent, those issues weren't litigated, this court said that doesn't matter. FERC set up a policy or a test. And when FERC comes to the next case, it has to either adopt a new test or it has to distinguish the cases that it previously addressed as they would be applied under its new test. So FERC cannot just say the issue wasn't as vigorously litigated. And my last point here, I know I'm pressing the court's patience, but very, very last minor point on that question. And that is if FERC had set even that point out of the record, it would have had a closer case. If it had said in Meet New York and Gridlines, these things weren't really contested. So we really only looked at the geographic location of the affiliated assets. But here we realize the corporate structure is a lot more important, and we should have looked at that in Meet New York and Gridlines. Now we're looking at it, and now we have this new test. Here's why it's consistent with the statute and the regulation. If they had set that out, it would be a closer case. We probably would still be making this argument. But they didn't make that finding or explanation in their orders below. They were making that solely on appeal. All right. Why don't we hear from counsel? Good morning. Carol Banta for the commission. To start, the commission is not arguing that it made a new test and met it here, and it didn't in these orders. This was always the test. It was the test set forth in Order 679, which was itself derived from standards that had been applied to the ITC companies themselves. They were held up as the gold standard in 679. So issues of corporate structure and governance were always an issue or were always part of the test. There are different factual ways to make the case on the record in an individual case, and that is what we have here. In Neat New York and in Gridliance, the commission said, based on the record here, this is what we're looking at. This is what people have raised. Did you explain in this case how it was different from Neat New York and Gridliance? Well, we didn't say it was different because it's the same test, but we did address the record that was here that wasn't there. So, for instance, in Rehearing Order Paragraph 20, we say evidence in this record. And I would add, in this case, parties on both sides brought in arguments about the corporate structure and governance in a way that just hadn't been done in the previous cases. Not only did the complainants raise issues about the ITC companies being less independent compared to their previous selves, but the ITC companies brought in their own evidence to try to make the point, no, our corporate structure and governance still maintain the same independence. Well, the commission looked at the evidence and was not persuaded by that. It said, yes, you retain some level of independence. The commission said that it made the comparison with this company pre-operation corporate structure. But nowhere did the commission seem to compare it with two of what looked like very similar cases. And you're giving us a distinction now, but I don't know that I find that the commission did that in the record. Well, because I don't think that the commission found those cases to be – I think they just found the records in that case to be something different. So it looked at what it had found in those cases and then – Even in the rehearing, even though you make the reference, you don't really – the commission in the rehearing did not tell us about the distinction you're now talking about. Shouldn't it at least have done so there when it knew what the – if you were – The commission, considering all different aspects of what can be considered on the facts of each case, it did look at the geographical distance among other things. In the initial order, it just didn't find that to be the facts that were as – not as important, but that showed the lesser independence here. We just had more evidence here, and we still don't have evidence in this record or the previous record that the Nexter and Gridliant corporate structures were. But it says that the commission did have the evidence as to what the corporate structures were in the prior – at least in New York, what the corporate structure was there, maybe in both of them. No, it's – They had that evidence for them to deny. They would not have it before them and be metronomically disinterminated. No, I don't believe that they did have that evidence, even the things that – So they were making a decision on the independence of the entity without having the corporate structure before them? Well, because the corporate structure isn't the absolute be-all, end-all of the test. It's one of many aspects under Order 679 gave parties a great deal of flexibility to make the case for their independence in different ways and looked at criteria that the commission would look at. It didn't set forth a checklist of every item that you must show. So different entities – Go ahead. I'm sorry, I didn't mean to interrupt. I was only going to say that the dozen or so different entities that have come in have come in with different kinds of evidence. And sometimes there are issues of corporate structure, and sometimes it's more focused with a small standalone company or standalone subsidiary about where it is. And it does, to some extent, depend on the parties on both sides of each case to compile the record that's before the commission. Oh, here's my question, Ms. Banta. The commission relies in part on the lack of dispute over independence, Stingray Alliance, and NextEra. But in the posture of applying for the incentive in the first place, wasn't it incumbent on the commission, whether or not anyone else raised the question, to make sure that it had all the information on all aspects of potential relevance? It seems like the commission – first of all, the burden is clearly on the commission to satisfy itself as to independence. And the commission in that posture has tremendous leverage to ask for the transmission to explain how – and to really probe any internal information it wants about corporate governance, internal structure, policy. So, I mean, when I was asking Mr. Street, I was saying maybe that cuts against him, but it can also be seen to cut against the commission. Well, what I would say, first of all, we are not arguing that it was not – that independence was not disputed. It's not like Baltimore Gas and Electric or, to some extent, San Diego Gas and Electric, where the abandonment incentive had been involved in a number of cases and often hadn't been disputed at the time. There was a dispute about independence in both – NextEra, especially, GridLiance, somewhat less, but NextEra. It's just that the concerns that were raised by the parties that raised – that disputed independence developed a certain record, which is what the commission looked at. But the commission is the party granting the incentive. That's what I don't understand. And the commission is the decider to satisfy itself that there's independence. So, I guess the question is, if the commission was able to ask everything of relevance and only asked about location and size of the affiliated market participants there, then why isn't it absolutely within ITC's prerogative to say, well, that's what they care about? I mean, they could and did bring in that aspect of the test, but they themselves also brought in other things, as did the complainants. But just to step back for a second, the way this plays out in many of these cases – and this one, you're right, it is procedurally different because it is a complaint against their existing adder having been given on certain premise of independence. In many of these cases, it's a lot like the cases that we discussed in the San Diego case, where parties came in with an array of incentives under Order 679, that they were asking for a variety of different rate incentives – the abandonment incentive in many cases, sometimes a risk-based incentive. And they came in with all different incentives and put forth their Section 205 showing of why they believed they qualified for it. And then there was a lot involved in these cases, and the other parties came in and disputed the various aspects that they thought were unwarranted. And so when you have a lot of flexibility in this very case-by-case analysis, I think Judge Williams, as he often did, had a pretty perfect analogy for this in his dissent in Baltimore Gas about the past vermicelli of agency cases and the litigant in the next case being invited to take a deep dive into the record of some past case that had a bunch of issues to try to say, well, these facts would have been different, and they're different here. But even here, when ITC companies said, no, wait, we are less independent than next era, the Commission, having found on the record here that they were less independent than their former selves that set the standard under Order 679, said, well, how do you mean you're less independent? And that record was not made – or, I mean, more independent. That record was not made. I'm sorry? More independent. You had said less independent, but I think you meant more independent before, right? I absolutely did, yes. Yes, I did. You startled me for a moment there. A lot of lessons. Okay, yeah, I apologize for that. Yes, when they tried to say they were more independent than next era, it's not that the Commission was putting the burden on them. It's that the Commission had found on the facts in this record that they were less independent than their previous iteration, which had been not only deserving of the full adder, but, again, the standard that was set for everyone. And if you want to raise a counterargument to the finding the Commission has already made, we need a record to do that, and we didn't have that. We have – I don't think we even have it now, even with items raised for the first time on appeal, but the Commission didn't have it. Yeah, so the question is not whether they're less independent, but – or whether they can show they're more independent, but whether they are as independent as the companies in next era and GridLions. And so it's a little bit conflating it to say, yes, it's maybe less independent than it was, than ITC was. But really the question is, is it right to line it up against next era and GridLions? And if it's right, then have you satisfactorily in this record distinguished the considerations in those cases from the considerations here? And I think because of the records in the different cases, we are trying to compare apples and oranges. We don't have that record – such a record about corporate governance. Why isn't that on your head? Isn't that your fault? You had every prerogative to develop and request whatever record you wanted. I think in these incentive cases, when companies come in asking for a lot of different incentives and they're disputed and litigated by a lot of parties, the record will be developed in different ways. And I don't know – I mean, if you've got the corporate structure in each of those records – I haven't reviewed it to find out, but it just seems impossible that the commission would be passing on this question of independence without having the corporate structure in the record. That just doesn't ring credible, Counsel. Well, I mean, the commission always knows that they're a stand-alone company or a stand-alone subsidiary. The actual – the evidence about involvement in the different boards and the decision-making – I don't know that we always have the record about that if someone hasn't raised the concern. So, have any third parties raised the kinds of petitions with respect to gridlines and NextEra that are raised here with respect to ITC? And is part of your position that if concerns develop, that that should occur? I think that's right. I know that there's been some concern, including expressed by the defense in this case, about NextEra. I don't know how much of that has to do with actual involvement in corporate governance and the right to control that raised concerns here. I think it's because NextEra is a very large company with a lot of subsidiaries. And so, people – so, some parties have raised concerns that just its size and reach raises concerns. But there's no Section 206 analogous challenge to the adder with respect to gridlines for New York? Certainly not that I'm aware. And Your Honor did make reference to the notice of proposed rulemaking from earlier this year, which appears on its face to stem from some concerns that subsidiaries of large companies that have a lot of subsidiaries in different markets with ITC companies and NextEra both being mentioned are perhaps behind that reconsideration. But I'm not aware of a 206. But if – that said, if a party came in with that kind of concern about the corporate governance of NextEra, I think that the commission in such a 206 proceeding would absolutely look at the record before it and probably be looking at this case as well. Does the commission have authority to do that on its own initiative, to reconsider an adder? It does. It does. I'm not aware of any case where it has. I mean, because – It's true in effect, but it would certainly bear the burden of proving its prior rate is unjust and unreasonable. Including putting together that record of vermicelli. But I would note that – I'm not on your response to Judge Pillard, so I'm clear what your argument is. In this case, objections were made to continuation of the 50-point adder, which was based on a level of independence. Now there's a merger. So the commission says, at a minimum, there's no longer that level of independence. So to the extent that Rice had approved the 50-point adder based on a level of independence, it's changed. And we need to figure out what would be appropriate. And I gather the commission came to somewhat of a compromise on that by coming to this 25-point adder. So at that point, the commission deals with the argument, essentially, that you're no longer as independent as you were at the time the commission found you were entitled to a 50-point adder. Or 100 in two of these. Or 100. Right. And so where does this take us? So the commission comes out with a decision. A petition for rehearing is filed. All right. Is it the commission's point that given sort of the posture of this case and the nature of the complaint that was brought to it, the burden was on the petitioners here to offer a record that would basically counter what the commission had determined and what the complaining parties had argued? Is that what we're trying to get at here? I mean, I understand the point, it's 206, the burden's on the commission, but the nature of what is before the commission here was determined by the complaint. And the commission itself was not engaging in an independent inquiry of its own under 206. Is that your argument? I don't think that was our argument. I think our argument was in the first order, we made a finding based on the various aspects, various criteria under Order 679. And we made the finding that you're less independent, the ITC companies are less independent than they were, than was the basis for their existing adder. On rehearing, the ITC companies said, among other things, we are more independent than Meet New York and Gridliance, so we should be treated the same as them. So on that argument, the commission said, we don't have the evidence in this record. And although I don't know if the commission said it, when we look at NextEra and Gridliance, we don't have evidence of any such record in those orders either. So I think the commission said, you say you're more independent, but you don't even say how. And most of the pages that the petitioner cite in their rehearing request, where they showed how they were more independent than NextEra, are actually just explanations of why they believe they're still independent. They're arguments about ITC companies. There's very little about NextEra in those materials or in the record of this case. So the commission is saying, if you're going to say you're more independent than someone else, we need more to go on because we're not seeing it. But we do have the factual finding we made as to your own independence. Santa, if this is a follow up to my question about whether the commission has authority on its own initiative, if it determined that indeed it couldn't reconcile its treatment of ITC with its treatment of Gridliance and NextEra, could it level everyone down rather than leveling ITC up? Do they, too, only deserve the 25 point counter? I mean, within the bounds of 206, I don't see why they couldn't. Right. I don't know of any indication that the commission intends to do that, but the commission would be able to. And I did want to mention earlier, just again, the commission does have the ability under 206 to challenge an existing adder. And just to show that the commission has, I think, waited for parties to bring these cases to it. Remember that two of these companies had 100 basis point adder that was given in the early 2000s. And in 2015, in the ITC Midwest case, the commission made the policy determination that the full adder is now 50. It did not make any effort to reach out and do a 206 and reduce everyone else's adders to 50. So I think it isn't looking to do that. So let me ask you, if we disagree with the commission's position, the positions are asking us to vacate as opposed to just remanding. What's your position on that? Well, we disagree. I mean, we don't see a reason to vacate. And I think... No, but the premise of my question was, if the court were to disagree with you... Right. Is it just a remand without vacating? Or is it your position that... I think your position is that you should be entitled on remand to look at the record that is currently before you, or before the commission, as distinct from a vacater, which would basically allow everybody to start all over again. Right. And certainly, I think if the case were remanded on the ground, what we've discussed with the factual record, I'm sure that the commission would develop that record further and look for the parties to develop that further. But I don't see any reason it wouldn't build on the existing. Well, I guess maybe my question wasn't clear. I think the commission is in two very different postures, depending on whether the court were to remand without vacating or to vacate. And that's what I was trying to get your position on. I think if it... I guess I don't really see the reason to vacate, because if it's a failure in the commission's explanation of its decision making, that is the kind of thing that the commission can fix it on remand. In statutory remedies, vacater is in there, and remand without vacater is not in there. And there's been a long dispute, Judge Friendly starting in the second circuit and Judge Randolph and I in this circuit, that we can't remand without vacating. At least it is kind of the ethnic precedent here that the norm is that we would vacate unless there's a reason to leave the action in effect and just remand. Why should we not vacate here? Well, I don't know what the implications of vacating are in this case. I'm sorry. You would not have this decision in place with the reference to what kind of adders they use. I keep saying the snakes when I say adders, but that decision would not be in place. You would be, not necessarily starting from round zero, but you would be starting at least from the decision making phase of the proceeding below, rather than having it in place and going back to just whether or not you give a different explanation. Right. Yeah, I don't know what ramifications that might have. Might it have implications for rate payers or not? It certainly would for rate payers. You're right. It absolutely would have ramifications for rate payers because I don't know the exact dollar amount. I know there are dollar amounts in here, but I don't know in the period of this case what the dollar amount is. I do know that the difference between the 50 basis point adder and the 25 that the commission still granted, I'm sorry, between the $100 and the $25 hasn't been that full amount for some time, I think, because there was also a cap on the upper zone of reasonableness for the entire return on equity. But I know there's ongoing litigation regarding that, and I think that there is a period at which the difference between the base rate of the return on equity and the zone of reasonableness cap is wider so that it actually would go from 25 to 100 and not to 50. So, it could have a very large impact for rate payers for whatever period of time that would apply. Anything further? I don't believe so. Thank you. Thank you. All right. Counsel for petitioners? My opposing counsel started off with her argument by saying corporate structure has always been the test for FERC. We would dispute that because in older cases, these were purely independent companies that were not within a corporate structure at all. But let's just accept that statement for a moment. Why in Neat New York and GridLions would there be no analysis of those companies' corporate structure, even though paragraphs 4 and 5 of Neat New York talk about the corporate structure of those companies? Why would there be no evidence in the record, even, of corporate structure in those cases if corporate structure had always been the test? I would submit that's just completely implausible. It is evidence of corporate structure to talk about whether those were project-specific entities, what kind of distance there was between their affiliates and the transcodes. Those are questions of corporate structure, the geographic questions, the size questions, aren't they? Well, I don't think I would characterize them that way, and I don't think FERC has characterized them that way. But if they are questions of corporate structure, then certainly FERC is looking at very different questions of corporate structure in the IPC case, where it's looking at the structural relationship of the transcode companies to its parent company when it comes to capital raising, when it comes to the way the board is formulated, when it comes to whether common stock can be issued. None of those traditional, classical corporate structure issues were considered at all in Neat New York and Gridlions, where they just talked about the nature and the size of the assets. And to respond to the argument that this is sort of a deep dive into the vermicelli, again, if corporate structure has always been the test, then this should have been front and center. And in our rehearing petition, we did raise all of these corporate structure issues that were brought to the forefront by FERC in its initial order. And we showed, by reference to both the public filings in Neat New York and Gridlions, and by reference to public Internet websites, that those companies were less independent than the IPC companies. And FERC, on page 45 of its brief, complained that we had cited, quote, filings in the Neat New York and Gridlions proceedings, end quote, about corporate structure. So the idea this was not in the record is rather implausible. This case involves a section 206 complaint saying the merger had occurred and the only reason FERC allowed the adder was because of the independence. Now that's changed. And the question is, or FERC said the current adder is no longer appropriate. Is it your position, then, that at that point you raised the Neat New York type argument? Our position... But it only developed on rehearing. No. In our opening argument and our answer to the complaint, we put on evidence of our corporate structure. And we said that we are functionally independent because we have our own board, majority controlled by our own people. We have the ability to issue debt.  So we make all those arguments in the opening. And further, that we're just like Neat New York? That's what I'm going to focus on. I understand you described yourself, all right, in response to the complaint. But it's a question about, did you put FERC on notice that you were taking the position that if you didn't prevail, then you would be being treated differently than Neat New York? Yes, absolutely, Your Honor. We pointed out that Neat New York and GridLiance were transcos within a larger corporate structure that owned massive amounts of affiliated generation. That was very much... Before rehearing. Yes. I mean, we made that argument before rehearing. I don't know that we went and did our own research about the record in Neat New York and GridLiance. But the relevant pages in the record would be JA182 and JA295 to 297. But I think my probably at least important answer to that question is that under this procedural posture, and this gets back to Judge Pillard's point as well, it actually, not only does it not cut against us, it cuts in our favor. Because as Judge Pillard pointed out, the burden was on FERC and Neat New York and GridLiance to do its own analysis of corporate structure of those companies and to determine whether they were truly independent. And in our case, we now have a complaint under Section 206. So if FERC wants to reduce the IPC company adder, it's not enough to just say the IPC companies have become less independent after the merger. It has to show why they have become less independent than the similarly situated companies in Neat New York and GridLiance. That was a burden on FERC as a matter of Section 206 and administrative law. Mr. Sheehan, what's your position on what would happen if we vacated and remanded? The adder would go to 100 points. What would be the impact on rate payers? How would you immediately recoup all of the, what is it, 24 million for the intervening period, 24 million annually? Give us a little bit of explanation on remanding. Sure. So my understanding is if the orders were vacated, there would be a return to the existing adder that was in place. However, that would be subject to pending litigation about the overall zone of reasonableness of the ROE. So if the ROE was set at a level below where our base ROE plus our adder is, then we wouldn't be able to recoup all of that amount. But the answer is there would be a period of time most likely where ITC would be able to recoup some of the adder that was improperly denied. And that would just be as a result of treating the ITC company similarly to Neat New York and GridLiance. And I think that question goes right to the heart of whether remand without vacature or vacature is appropriate. And I take Judge Santel's point that this is not in the statute and perhaps the Supreme Court's recent DACA case shows even more doubt on whether you can have a remand without vacature. But assuming that option is on the table, that only has been applied when FERC just has to give more explanation for a result that it's likely it's going to be able to sustain. And from everything we know about this record, the ITC companies are more independent on every metric. They don't have affiliated generation inside the ISO. They have their own board. And everything else, they're on equivalent basis. So if this goes back, FERC is going to have to decide, is it going to apply the 50-point basis adder consistently and give the ITC companies 50? Or is it going to have to go back completely to square one and say, we think we've messed this all up and we need to bring everybody down to 25 or we need to just see what happens in our rulemaking? But none of those are just the instance of giving a little more explanation under an arbitrary and capricious challenge. What's the Supreme Court DACA case you cited? It's the Department of Homeland Security versus the Regents of California, where Chief Justice Roberts, in his majority opinion, suggests that he rejects the idea that there should be a remand without vacature of the DACA rule regarding the undocumented immigrants who arrived as children. All right. Well, this court's outstanding precedent allows a remand without a vacater. Judge Randolph and I have lost that argument. And Judge Randolph and Judge Santel do not agree. But that, nonetheless, is our precedent. And one of the things we take into account is the disruption that vacater might entail. And I need to understand, I get the point. You retain your 50-point adder. But in addition, you were talking about recouping in response to Judge Pillard's question. How does that recoupment occur? I may have used an imprecise term in that instance. I think what I would say is that the 50-point and the 100-point adder that are relevant to the respective companies would come back into play at the time the court vacated the orders. So I don't think there would be any retrospective. My understanding is there would be no retrospective relief. And I may have used the wrong word. I can certainly confirm that. So no recoupment. I just want to be clear. That is my understanding. And, Your Honor, if I learned something different, as soon as I finish this argument, I will immediately let the court know. But that's my understanding. And I use that perhaps very loosely to say we would begin to recover the rate adder that we were entitled to relative to Neat New York and Gridlions. And I certainly understand that the D.C. Circuit has its longstanding precedent about the availability of remand. No, what I'm focusing on now is not our precedent in that regard, but in terms of when you're before FERC, you're able to prevail in the sense of FERC ordering refunds and that type of thing. That's what the recoup word signaled to me in terms of disruption. But you're talking about a forward remedy, I gather, that you retain the 50 points you have and then FERC would have the burden to explain why, if it retains that position, you're not entitled to it. That's correct. That's correct. My understanding is that when FERC issued these orders, it ordered refunds, and that refund period runs for a certain amount of time. And if we were to prevail and the orders would be vacated, which, again, I would say is an appropriate approach under this court's precedent in Southwest Airlines and West Deptford, which also had implications for rate payers, then we would be able to begin collecting the adders that were previously in place to the extent that's not inconsistent with any refund order of FERC. You were no longer collecting on the basis of that adder? We have not been collecting on the basis of that adder for a long time as a result of these orders. Thank you. Two questions about that. One is, wouldn't it be your position that a remedy then would be that you would be entitled to reach back for that period where it was unjustified and collect? And the second is, you were mentioning 50-point versus 100-point. I thought Ms. Banta had said that the adder would go back to 100-point. No, she didn't. There are three IPC companies. Two of them went into the FERC proceedings below with a 100-basis point adder. One of them went into the proceedings below with a 50-basis point adder. They were, of course, all reduced to 25 as a result of this order. So if these orders were vacated, one of them would go back up to 50. The other two would go back up to 100. And we would argue that certainly at that time we would be able to begin recovering those adders. Again, subject to litigation, which is still ongoing over the overall zone of reasonableness, which could cut back into those adders. And I think to Your Honor's first question, to the extent we would be entitled to anything retrospective, it would be whatever is consistent with FERC's authority to order refunds as a result of its initial orders. And, you know, I think that would be perfectly consistent with FERC's practice in the past and this court's remand orders in the past. This is just one more question, and I apologize that I'm keeping everyone so long. And I understand this is not your position, but if their standard wasn't changing, they have a standard under which they look at all factors relevant to independence, but their applications over time are growing more nuanced. You said, of course, their ability to apply their standard wouldn't be frozen as long as they adequately explained. Is that an accurate recap of your position? Yes, I think so. For example, assuming you did accept our position that they had sort of changed the test here without acknowledgement or explanation. For purposes of this appeal, we're not saying they substantively couldn't do that as a matter of the regulation or as a matter of the statute. We're saying that if they want to evolve or make their test more nuanced, They just have to face up to it and say, we're changing our test. We're more explicitly looking at all circumstances. We're expressly going to look at corporate structure in this way. And then that can be judicially reviewed by this court, whether that's inadequate. Now, the premise of my question was that they're not changing their test. They're applying it, looking at investment planning, capital formation, investment processes, but looking at more facts. I mean, think of any totality of circumstances test. In one case, you have how are different employees treated differently to show discrimination. In another case, you have direct evidence. In a third case, you have a sequence of events. I mean, you don't require every kind of evidence in every case, but the standard may nonetheless be the same. Your argument is that they can become more detailed in the evidence they look at, but they still have to explain that they are doing that? Yes. Your best case for that. Well, I think cases that talk about the evolving nature of case-by-case analysis, West Dufford and others, Southwest Airlines, are cases where the commission made those arguments, and this court says, there still has to be an adequate and reasoned explanation of an evolving test, even a test that's not a radical departure. And, of course, even under that theory, under the new test, it would have to show why light companies are being treated alike and not being differently treated. And that's what we think. They also fall short on here. But I guess if I could just wrap up, and maybe I'm, again, resisting the premise of the question a little bit, but very briefly I would just say we completely agree that the commission has always inherited the Order 679 criteria. It's always said we're evaluating investment planning, processes, capital formation, and business structure. But if you read paragraph 51 of Meet New York, it says here's how that test is met. And it's met only by looking at geography. It's a completely different situation under the ITC company's test. All right. Thank you. Thank you, Your Honors. We'll take the case under advisory.
judges: Rogers, Pillard, Sentelle